IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| KATHRYN M. P.,[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 18-cv-2035-DGW[2] |
| | ) |
| COMMISSIONER of SOCIAL SECURITY, | ) |
| | ) |
| Defendant. | ) |

## **MEMORANDUM and ORDER**

**WILKERSON, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff, represented by counsel, seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) benefits pursuant to 42 U.S.C. § 423.

## **Procedural History**

Plaintiff applied for benefits in November 2014, alleging disability beginning on October 22, 2014. (Tr. 67). After holding an evidentiary hearing, the Administrative Law Judge (ALJ) denied the application for benefits in a decision dated February 14, 2018. (Tr. 13-28). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been exhausted and a timely complaint was filed in this Court.

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c) and Administrative Order No. 240. See, Docs. 8, 19.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ erred by failing to account for moderate deficits of concentration, persistence, or pace in the RFC finding.

2. The ALJ did not adhere to SSR 96-8p when she ignored evidence in her residual functional capacity (RFC) determination for claimant.

3. The ALJ erred in failing to identify the evidentiary basis of her assessment of plaintiff's RFC.

## Applicable Legal Standards

Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a). To determine whether a plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the plaintiff unable to perform her former occupation? and (5) Is the plaintiff unable to perform any other work? 20 C.F.R. § 416.920(a)(4).

An affirmative answer at either step 3 or step 5 leads to a finding that the plaintiff is disabled. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001). A negative answer at any step, other than at step 3, precludes a finding of disability. *Ibid.* The plaintiff bears the burden of proof at steps 1–4. *Ibid.* Once the plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner

to show the plaintiff's ability to engage in other work existing in significant numbers in the national economy. *Ibid.*

## The Decision of the ALJ

The ALJ followed the five-step analytical framework described above. She determined that plaintiff had not worked at the level of substantial gainful activity since the alleged onset date. The ALJ found that plaintiff had severe impairments of somatic symptoms disorder, depression with anxiety, bilateral osteoarthritis of the hands, seronegative rheumatoid arthritis (RA), mild lumbar facet osteoarthritis, morbid obesity, diabetes mellitus, neuropathy, and mild bilateral hip osteoarthritis.[3]

The ALJ found that plaintiff had the RFC to perform work at the light exertional level, limited to no climbing of ladders, ropes, and scaffolds; occasional climbing of ramps and stairs; occasional stooping, crouching, crawling, and kneeling; and frequent handling and fingering. She was also limited to performing simple routine tasks but not in a fast paced, production environment, such as an assembly line. Based on the testimony of a vocational expert (VE), the ALJ concluded that plaintiff was unable to do her past relevant work, while also making an alternative finding that she was able to do other jobs at the light exertional level which exist in significant numbers in the national economy.

## The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in

---

[3] "Somatic symptom disorder is characterized by an extreme focus on physical symptoms — such as pain or fatigue — that causes major emotional distress and problems functioning. You may or may not have another diagnosed medical condition associated with these symptoms, but your reaction to the symptoms is not normal." http://www.mayoclinic.org/diseases-conditions/somatic-symptom-disorder/symptoms-causes/syc-20377776, visited on June 11, 2019.

formulating this Memorandum and Order. The following summary of the record is directed to the points raised by plaintiff.

1. **Agency Forms**

Plaintiff was born in 1968 and was almost 47 years old on the alleged onset date of October 22, 2014. (Tr. 67). Plaintiff submitted a function report in which she complained of intense pain that kept her awake at night and numbness upon waking up. She stated that she had trouble dressing, bathing, and grooming herself because of arthritic pain and a limited range of motion. (Tr. 207). She claimed she had concentration and memory problems, but later stated that she could pay attention in 15 minutes intervals and follow instructions. (Tr. 210-211). She admitted preparing simple meals daily, driving, grocery shopping weekly, and taking short walks regularly. (Tr. 208-210).

In a pain questionnaire submitted by plaintiff, she stated had pain in her arms, legs, hips, lower back, knees, and fingers. She described the pain as pulsating, radiating, virtually constant, and like "ripping arms off." She alleged that any movement triggered pain for her, including changing sleep positions. She reported taking Humira, methotrexate, Plaquenil, and sulfasalazine. (Tr. 226). She stated that she could no longer cook meals, bake, do yardwork, go antiquing, or attend social events with friends. (Tr. 227).

2. **Evidentiary Hearing**

Plaintiff testified that she lived by herself. She reported her height as 68 inches and weight as 298 pounds. (Tr. 43). She earned a bachelor's degree in 1997. (Tr. 43-44). When asked about impairments that limited her ability to work, plaintiff

stated that she suffered from incredible amounts of pain throughout her body from severe RA. (Tr. 44). Plaintiff claimed that, even with medications, she experienced symptoms of RA daily. Plaintiff described the pain as shooting and pulsating; and said she felt achy and sore. (Tr. 45). She also said that she suffered from fatigue from the pain and swelling in her wrists, fingers, knees, and ankles that was exacerbated by activity. (Tr. 45-46). When asked about how she spent a normal day, plaintiff stated that she spent most of the day in a reclined position. (Tr. 52).

Regarding flexibility, plaintiff stated that she had trouble gripping with her hands, bending, stooping, and reaching out. (Tr. 46). Plaintiff claimed she had an abnormal gait and reduced balance. She stated that she could only take small steps and suffered from stiffness when trying to walk. She reported using a walker for assistance, which helped her shift her weight and reduce tension in her back and hips. She said that without the walker, she could not walk a block. (Tr. 47).

Plaintiff admitted to grocery shopping, although she stated she used an electric scooter and had trouble getting items into her cart. She also admitted to cooking simple meals. She said that she required assistance with cleaning and had difficulty with personal hygiene, including bathing. (Tr. 50-51).

A VE also testified. As there is no issue as to her testimony, it will not be summarized.

### 3. Medical Records

Plaintiff visited her primary care physician, Dr. Anne Walentik, in February 2014, complaining of tightness in her chest that radiated to her back, which started in January of that year. (Tr. 259, 266, 565). She stated that she continued to have

fatigue, squeezing, and pressure sensations. (Tr. 266). Plaintiff received a stress echocardiogram, which came back normal, and was diagnosed with chest pain. Dr. Walentik prescribed ibuprofen and Tagamet; and sent her home with orders to follow up in two weeks. (Tr. 262-263, 278). Plaintiff continued to complain of chest pain when she followed up in March 2014. (Tr. 278). Her cardiologist ordered a heart holter and prescribed aspirin along with nitroglycerin. (Tr. 281).

Later in March, her cardiologist found that plaintiff's chest pain was likely non-cardiac considering her normal stress test, echocardiogram, heart holter monitor, and electrocardiogram results. Her cardiologist deferred further cardiac testing and referred the patient to psychiatry due to a panic attack and two 8-page letters plaintiff sent to her mother's orthopedic surgeon "detailing her every thought." (Tr. 307, 400). Plaintiff then saw a psychiatrist. The psychiatrist diagnosed plaintiff with major depressive episode and found that plaintiff would benefit from an antidepressant and therapy. The psychiatrist also noted that plaintiff's subjective symptoms included low mood and decreased interest and motivation in doing her job and usual activities. (Tr. 314).

In 2014, plaintiff reestablished care with Dr. Walentik. Dr. Walentik reported plaintiff's previous cardiac episode and stated that plaintiff was prescribed Prozac, but had not started taking the drug. Plaintiff complained of chest pain, exhaustion, and fatigue. Dr. Walentik also observed the continuing problems of plaintiff not checking her blood sugar or taking her prescribed Metformin medication for her diabetes due to fear it would cause hypoglycemia. (Tr. 259, 272, 289, 309, 327, 331).

Later in the year, plaintiff showed up to a follow up appointment "visibly stressed," and stated that she had been "in a health crisis since February." She was also referred to psychiatric again after reporting chest pains, shortness of breath, and anxiety. She declined treatment. (Tr. 416). In July, plaintiff started reporting numbness and tingling in her extremities with balance issues. (Tr. 441, 471, 473, 477). In October, plaintiff started taking Metformin again. (Tr. 533). She was referred to a rheumatologist for persistent pain in her joints, upper arms, hands, hips, legs, and lower back that was suggestive of polymyalgia rheumatica. (Tr. 533, 562, 564, 591). She also reported having "muscle seizures" and a "tumor in stomach" now for 2 years. She stated the tumor was benign, but never had a biopsy. (Tr. 533, 565). A later endoscopic procedure did not reveal a tumor. (Tr. 681-682). Plaintiff also visited the emergency room and complained of severe pain throughout her body with minimal relief from her medications. She told her attending physician that she had a muscle disease. Testing revealed that she had negative results for rheumatoid factor, antinuclear antibody, and antineutrophil cytoplasmic antibodies. She was diagnosed with fibromyalgia. (Tr. 684, 689, 700).

In December 2015, on referral from Dr. Walentik, plaintiff began seeing Dr. Prabha Ranganathan, a rheumatologist. (Tr. 716, 721). Plaintiff complained of severe pain throughout her body and the inability to complete activities of daily living. (Tr. 716). Dr. Ranganathan ordered x-rays of plaintiff's hands that revealed bilateral ulnar minus variance with moderate to severe distal radial ulnar joint osteoarthritis and mild left first carpometacarpal joint osteoarthritis. (Tr. 720). In February 2015, he diagnosed plaintiff with RA and prescribed, at varying times, prednisone,

Enbrel, folic acid, methotrexate, sulfasalazine, and Plaquenil to treat the condition. (Tr. 712, 715, 721).

In May 2015, plaintiff saw Dr. Laurain Hendricks. (Tr. 770). After previously noting an abnormal gait and limited ambulation, Dr. Hendricks later noted varying degrees of ability in terms of gait and ambulation. (Tr. 766, 769, 772). She additionally diagnosed plaintiff with depressive disorder and prescribed Zoloft. (Tr. 767).

In 2016, plaintiff visited Alton Health Center, where she saw Dr. Sambasivam Suthan. Dr. Suthan indicated she was "[b]orrowing mom's rollator at times who is shorter than [plaintiff] hence may compromise her posture, wants one of her own if needed." (Tr. 943). He described plaintiff's ambulation and gait as normal, but approved plaintiff's "as needed" acquisition of a rollator. He also noted she was awaiting steroid shots for her knee related to her RA. (Tr. 943-944). In 2017, Dr. Suthan noted that plaintiff complained of generalized body pain. (Tr. 1054). He additionally reported that plaintiff was using a walker at her clinic appointments, but also described her as ambulating normally. (Tr. 1054, 1074, 1153).

### 4. Consultative Examinations

In April 2015, Dr. Raymond Leung performed a consultative physical examination at the request of the agency. (Tr. 705-711). Dr. Leung noted a past medical history significant for a diagnosis of fibromyalgia. (Tr. 705). He diagnosed plaintiff with diabetes, RA, sleep apnea, and morbid obesity. (Tr. 707-708). He remarked that plaintiff's gait "was significant for a mild limp and waddle," however, he said plaintiff was able to walk 50 feet unassisted. Plaintiff was also able to tandem

walk, but was unable to hop, heel walk, toe walk, or fully squat. She had decreased range of motion in the shoulders, knees, and lumbar spine; but Dr. Leung did not observe any spasms. (Tr. 707).

### 5. State Agency RFC Assessments

In March 2016, acting as a state agency consultant, Dr. David Biscardi, Ph.D., assessed plaintiff's mental RFC based on a review of the file materials. He found plaintiff to have moderate impairments in concentration, persistence, or pace. He also stated plaintiff was moderately limited in her ability to carry out detailed instructions, perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; and complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 89, 93-95).

## Analysis

Plaintiff argues that the ALJ ignored evidence in her RFC findings that would undermine her conclusion. In assessing a plaintiff's RFC, an ALJ must consider all relevant evidence in the case record and evaluate the record fairly. *Golembiewski v. Barnhart,* 322 F.3d 912, 917 (7th Cir. 2003); 20 C.F.R. § 404.1545 (a)(1) and (3). While the ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to his findings. *Ibid.* (citing *Dixon v. Massanari,* 270 F.3d 1171, 1176 (7th Cir. 2001) and *Zurawski,* 245 F.3d at 888). Otherwise, it is impossible for a reviewing court to make an informed review. *Golembiewski,* 322 F.3d at 917 (citing *Smith v. Apfel,* 231 F.3d 433, 438 (7th Cir.

2000)).

While plaintiff's accusation that the ALJ ignored evidence of her need to occasionally use a walker is incorrect, and the ALJ properly weighed that evidence, plaintiff's argument still carries the day because of an entire line of evidence ignored by the ALJ. In her decision, the ALJ stated that plaintiff did not follow up on multiple referrals to a rheumatologist after going to the emergency room in October 2014. (Tr. 21). However, two months later, in December 2014, plaintiff started seeing Dr. Ranganathan, a rheumatologist. Dr. Ranganathan diagnosed plaintiff with RA and prescribed different medications for the ailment over a period of at least three appointments spanning from 2014 to 2015. All of these visits are missing from the ALJ's decision.

Additionally, the ALJ misstated evidence. The ALJ attributed a note to Dr. Hendricks which stated that the plaintiff returned for a follow up appointment in May 2015 and said that she had not been doing well since her last visit. (Tr. 22). Upon review, there is not a note in the record from Dr. Hendricks that relays this information. There is a note from Washington University in St. Louis Physicians nurse practitioner Julie Ann Unk that matched the summary, though. (Tr. 832). That part of the record is from July 2015.

Moreover, while it is appropriate for the ALJ to consider daily activities when evaluating credibility, "this must be done with care." *Roddy v. Astrue*, 705 F.3d 631, 639 (7th Cir. 2013). The Seventh Circuit has called improper consideration of daily activities "a problem we have long bemoaned, in which administrative law judges have equated the ability to engage in some activities with an ability to work full-time,

without a recognition that full-time work does not allow for the flexibility to work around periods of incapacitation." *Moore v. Colvin*, 743 F.3d 1118, 1126 (7th Cir. 2014). In this case, the ALJ made attenuated connections between plaintiff's day to day activities and her capacity to work a full-time job. Specifically, the ALJ stated that "the claimant has reported she reads and watches TV on a regular basis, which requires at least some level of concentration." (Tr. 18). Contrary to this contention, the Seventh Circuit has opined that they are "skeptical that the ability to watch television for several hours indicates a long attention span . . . ." *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). The Court also later found that an ALJ erred in equating ability to play video games and do online research with ability to concentrate enough to work. *Voigt v. Colvin*, 781 F.3d 871, 878-79 (7th Cir. 2015).

The lack of evidentiary support in this case requires remand. "If a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required." *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (internal citation omitted).

Additionally, the Court will point out that while the ALJ concluded that the objective medical evidence indicated that plaintiff's impairments could reasonably be expected to cause her alleged symptoms, she also concluded that plaintiff's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." The Seventh Circuit has called this language "even worse" than "meaningless boilerplate." See *Bjornson v. Astrue*, 671 F.3d 640, 645–46 (7th Cir. 2012); see also *Brindisi v. Barnhart*, 315 F.3d 783,

787–88 (7th Cir. 2003).  On remand, the ALJ should be more vigilant in addressing this issue as well.

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff was disabled during the relevant period, or that she should be awarded benefits.  On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying plaintiff's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**

**DATE:   June 13, 2019.**

*[signature: Donald Wilkerson]*

**DONALD G. WILKERSON**
**UNITED STATES MAGISTRATE JUDGE**